**[Cite as *State v. Hall*, 2025-Ohio-3099.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

State of Ohio

        Appellee

v.

Glenn P. Hall

        Appellant

Court of Appeals No.  H-24-022
                     H-24-023

Trial Court No.  CRI20230507
                 CRI20230707

**<u>DECISION AND JUDGMENT</u>**

Decided:  August 29, 2025

* * * * *

James Joel Sitterly, Huron County Prosecuting Attorney, and
Barry R. Murner, Assistant Prosecuting Attorney, for appellee.

Russell S. Bensing, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** In this consolidated appeal, following a jury trial, defendant-appellant,

Glenn P. Hall, appeals the May 6, 2024 judgments of the Huron Court of Common Pleas,

convicting him of aggravated burglary, burglary, aggravated menacing, intimidation of an

attorney, victim, or witness, felonious assault, and domestic violence.  For the following reasons, we affirm the trial court judgment.

## I.  Background

{¶ 2} Glenn P. Hall was indicted in Huron County Court of Common Pleas case No. CRI20230507 on the following offenses:  aggravated burglary, a violation of R.C. 2911.11(A)(1) and (B), a first-degree felony (Count 1); burglary, a violation of R.C. 2911.12(A)(1) and (D), a second-degree felony (Count 2); two counts of menacing by stalking, violations of R.C. 2903.211(A)(1) and (B)(2)(b), fourth-degree felonies (Counts 3 and 4); aggravated menacing, a violation of R.C. 2903.21(A) and (B), a first-degree misdemeanor (Count 5); and domestic violence, a violation of R.C. 2919.25(C) and (D)(5), a third-degree misdemeanor (Count 6).

{¶ 3} Hall was also indicted in Huron County Court of Common Pleas case No. CRI20230707 on two counts of intimidation of an attorney, victim, or witness in a criminal case, violations of R.C.2921.04(B)(1) and (D), third-degree felonies (Counts 1 and 2); two counts of felonious assault, violations of R.C. 2903.11(A)(1) and (D)(1)(a), second-degree felonies (Counts 3 and 4); two counts of domestic violence, violations of R.C. 2919.25(A) and (D)(2), first-degree misdemeanors (Counts 5 and 6); and abduction, a violation of R.C. 2905.02(A)(2) and (C), a third-degree felony (Count 7).

{¶ 4} Case Nos. CRI20230507 and CRI20230707 both involved offenses committed against Hall's girlfriend, A.K.  They were tried together to a jury beginning April 25, 2024.  The State presented evidence from Norwalk Police Department Officer

2.

Jacob Tyman (who is now an Erie County Sheriff's deputy), Sergeant Justin Fuller, and Detective Scott Hamernik; Huron County Sheriff Lieutenant William Duncan; Ohio Bureau of Criminal Investigations Agent Megan Roberts and forensic scientist Nicole Augsback; the victim, A.K.; and the victim's co-workers, O.L, G.S., and M.L. Hall presented evidence from his sisters, L.H and K.H.; his co-workers, K.R. and T.C.; and his private investigator, Tom Pavlish. The parties entered into evidence numerous photographs, text messages, body camera recordings, and jailhouse phone calls between Hall and A.K., Hall and his mother, and Hall and his sister.

## A. Case No. CRI20230507

{¶ 5} According to the State, Hall and A.K. met in 2021, while both were working at Bob Evans. At that time, A.K. was 16 years old and Hall was 32. Hall's mother, C.H., also worked at Bob Evans, as did his sisters, K.H. and L.H. A.K. testified that she had been on her own since she was 17 because her mother was abusive, her mother's boyfriend molested her, and her grandmother told her that she was not welcome in her home. She explained that she viewed several co-workers, including Hall's mother and sisters, as her family.

{¶ 6} Hall and A.K. started dating seriously in early 2023. Hall lived with his sister on River Road in Milan, but frequently stayed at A.K.'s apartment on North West Street in Norwalk. In May of 2023, Hall and A.K. rented a house together on Peru Center Road in Willard, but A.K. maintained her apartment. Hall and A.K. got engaged and planned to marry on June 9, 2023, but A.K called off the wedding the day before. She

3.

testified that she did this because Hall had been verbally and mentally abusive, however, she told Hall that she was not ready yet.

{¶ 7} After calling off the wedding, A.K. felt that Hall was becoming even more controlling and possessive, he constantly accused her of having an affair, and he threatened her life. A.K. returned to her empty apartment and slept there. She and her friend O.L., with whom she worked, devised a plan for her to move her belongings out of the Peru Center home on June 19, 2023, while Hall was at work. They changed the locks on the apartment door.

{¶ 8} Hall did not come after A.K. when she first returned to her apartment. A.K. found this reassuring, so she agreed to meet up with him at his sister's house. They ended up staying the night together at the Peru Center home.

{¶ 9} On June 23, 2023, Hall wanted to see A.K. before she went to work at 3:00 p.m. They met at the tennis courts and exchanged "I love you's," and A.K. told Hall that they could talk more later. Once at work, however, A.K.'s friends encouraged her to end the relationship because they feared for her safety. A.K. texted Hall and told him that she needed time and space. Later that evening, Hall repeatedly texted A.K. After 1:00 a.m., he asked if she was there and she said yes. He continued texting roughly every ten minutes until 1:54 a.m., but A.K. had fallen asleep and did not respond.

4.

{¶ 10} Shortly after sending the 1:54 a.m. text message, Hall climbed the balcony to A.K.'s second-floor apartment, jiggled the slider until the latch came open,[1] and entered the apartment. Hall used A.K.'s phone to call their co-worker, M.L., with whom he believed A.K. was having an affair, because he expected that M.L. was hiding somewhere in the apartment and he would hear M.L.'s phone ring. He dumped all the alcohol in the house into the sink, and he rifled through the bathroom trash and found a positive pregnancy test. Hall then shook A.K. awake, yelled at her, dragged her onto the apartment balcony, and threatened to kill her. He wanted to know who helped her move out and who bought her the alcohol, but A.K. refused to tell him.

{¶ 11} About a half-hour later, Hall went into the apartment to use the bathroom, and A.K. used this opportunity to text another co-worker, G.S. (who she calls dad). G.S. asked if he should call the police, and A.K. said yes. O.L. had alerted the police earlier that Hall had threatened A.K. and requested extra patrol in the area of A.K.'s residence, so police were already close by. Officers shone a flashlight on the balcony. Hall told officers that A.K. didn't want them in her apartment, but they insisted that Hall come down and speak with them.

{¶ 12} The interaction was recorded on officers' body cameras. Hall claimed that he was at the apartment because A.K. had told him that morning that she was pregnant and they were discussing the pregnancy. He said that he had been invited, but that she

---

[1] In body camera footage, A.K. suggested that the slider was not actually locked.

didn't respond to his calls and texts and did not answer the door when he knocked, so he climbed up the balcony and let himself in. He claimed that she was passed out and he was worried.

{¶ 13} Meanwhile, other officers went up to the apartment and spoke with A.K. She was crying and told officers that she was scared because Hall told her he was going to kill her. She said that Hall most recently threatened to kill her ten minutes earlier.[2] Hall had convinced her that the officers were there to arrest her because she had had a shot of alcohol[3] despite being underage. A.K. confirmed that she had not invited Hall over and had even changed the locks, but Hall climbed the balcony to get in.

{¶ 14} Hall was arrested and taken to jail. He was released on bond three days later with orders not to have contact with A.K. His actions while out on bond led to the filing of Case no. CRI20230707.

{¶ 15} In jailhouse phone calls, Hall repeatedly characterized his breaking into the apartment as a "welfare check." He maintained that he had done it because he was worried about A.K. and was looking out for her, however, he admitted in a call with his mother that he looked in the refrigerator and found alcohol, found the positive pregnancy

---

[2] When interviewed by Hall's private investigator on October 4, 2023, A.K. denied that Hall had threatened her. She testified that she said this because his charges would be less serious and she thought she would be in less trouble with Hall if she said he did not threaten her.

[3] A.K. testified at trial that she drank a beer, but in the body camera recordings, she said she drank a shot.

6.

test in the trash, then "woke [A.K.] up after a while." In a phone call with his mother on June 25, 2023, Hall also acknowledged, "I knew what I was doing was dangerous and illegal . . . and I knew I was putting myself at risk."

## B. Case No. CRI20230707

{¶ 16} Once released on bond, Hall had frequent contact with A.K. A.K. acknowledged that she instigated contact with him and began staying with him at the house on Peru Center Road and then at her Norwalk apartment. She took measures to avoid being seen by police and she kept this a secret from friends who may have tried to dissuade her from being with Hall. A.K. and Hall used burner phones and put fake names into their contacts to try to disguise their communications. But Hall was pulled over on July 31, 2023, with A.K. in the vehicle, leading to his bond being revoked on August 18, 2023.[4]

{¶ 17} While preparing for trial in Case no. CRI20230507, witnesses divulged that Hall had physically assaulted A.K. in August of 2023. A.K. was interviewed on October 31, 2023, and told detectives about two incidents.

{¶ 18} One of those incidents occurred on August 11, 2023. A.K. claimed that Hall woke her at 1:00 a.m., again accusing her of having an affair with M.L. She said he was drunk and he repeatedly punched her in the head trying to get her to confess to

---

[4] Despite being ordered to avoid contact with A.K., Hall called A.K. hundreds of times while he was in jail. Officials finally discovered these phone calls in January of 2024, and blocked Hall's ability to call A.K.'s telephone numbers.

7.

having sex with M.L., but she refused. A.K. claimed that Hall punched her continuously from 1:00 to 4:50 a.m. He stopped beating her to go to the bathroom and she jumped out the window, ran barefoot to the neighbor's property, and screamed for help. According to A.K., Hall followed her out the window, caught up with her, and tackled her. He told her that if the police came, he would engage them in a shootout.

{¶ 19} A.K. maintained that Hall threw her keys and phone on the ground and she picked them up and left in her car. Meanwhile, Hall was texting her asking her to come back and promising to sleep upstairs if she returned. These text messages were admitted into evidence and showed that at 4:42 a.m., A.K. responded to Hall's texts, saying, "[t]he second I come back you'll just be twice as mad at me and actually kill me for leaving like u said u would[.]" Hall tried to assure her that he would not hurt her. A.K. said, "[y]ou fucking will . . . I heard what u said to me . . . I'm just this close to death you're gonna fucking kill me[.]" Hall told her he didn't "care about that shit anymore" and "could never hurt her." A.K. responded, "Fuck u I would never hurt u[.] I can't go into work tmrw because of my face[.] I have dried blood everywhere[.] My hair is like straw and my entire face is fucked because of you[.]"

{¶ 20} Despite the fact that A.K. believed that Hall may kill her if she came back, she testified that she could not see to drive because her eyes were swollen shut from the beating, so she returned to the house and went to bed. Minutes later, Hall came up and began beating her again. A.K. maintained that Hall had beaten her so severely that she lost consciousness around 7:00 a.m.

8.

{¶ 21} A.K. testified that she could not eat after the August 11, 2023 incident because she couldn't chew, and she spent the better part of five days in bed. A.K. also testified that she did not go to work for eight days because she had two black eyes. A photograph of A.K.'s face showed dark colored bruises around both eyes. Text messages between A.K. and Hall's mom and sister, C.H. and K.H., showed that they tried to help her apply makeup to cover the bruises, but the bruises could not be concealed. At Hall's insistence, C.H. covered shifts for A.K. because otherwise, people would have seen that he inflicted A.K.'s injuries. Even so, when she went back to work, there was blood in the whites of her eyes, which her coworkers asked about. Hall instructed her to say that she broke blood vessels because she had been vomiting, and she hit her face on the toilet.

{¶ 22} In a phone call from the jail on April 25, 2024 (during trial), Hall said that he would "admit to what he did, which is, yeah, I hit her that night. I was really intoxicated and found out a bunch of bad stuff. . . . It was domestic violence, that's what it was." In a phone call with A.K., Hall repeatedly refuted details that A.K. shared with police about the August 11, 2023 assault, but did not challenge her assertion that he had beaten her while she begged him to stop.

{¶ 23} At trial, K.H. acknowledged her belief that Hall had struck A.K., but she insisted that the bruises were nowhere near as bad as depicted in the photos, and she suggested that A.K. used Halloween makeup to intensify the appearance of the bruises.

{¶ 24} A.K. also claimed that three days before this beating, after a night of drinking, Hall hit her in the head with an Absolut Vodka bottle, causing her to lose

9.

consciousness. The bottle shattered, but she did not know if it fell to the ground or if it shattered due to the impact with her head. Hall then pushed her to the ground on top of the glass, cutting her back.

{¶ 25} BCI Agent Megan Roberts investigated the scene on November 2, 2023. There was, in fact, a shattered Absolut Vodka bottle still on the garage floor, and several brownish spots located on the bedroom wall and garage floor, which tested presumptive positive for blood. BCI forensic scientist Nicole Augsback testified that two of those swabs—one from the garage floor and one from the bedroom wall—contained A.K.'s DNA.

{¶ 26} Finally, numerous jailhouse phone calls between Hall and his mother revealed that at Hall's insistence, his mother and sisters tried to persuade A.K. to tell the State that she had invited Hall to her apartment on June 24, 2023, he never threatened her, she did not wish to prosecute, and she did not want a protection order. A.K. also testified that after Hall met with his attorney and viewed the video evidence from June 24, 2023, of A.K. telling officers that Hall was uninvited and had threatened her, Hall punched A.K. and told her that he had done so because of what she said to the police on June 24, 2023.

{¶ 27} Hall presented the testimony of several witnesses who testified that A.K. had a reputation for being untruthful. He also sought to show that A.K. bullied co-workers at Bob Evans, that she had an alcohol problem, that she gave inconsistent statements about the circumstances giving rise to the charged offenses, and that the

10.

incident with the Absolut bottle could not have happened without A.K. suffering serious injuries requiring medical attention.

## C. The Verdicts

{¶ 28} In case No. CRI20230507, the jury found Hall guilty of aggravated burglary (Count 1), burglary (Count 2), and one count of aggravated menacing (Count 5)—counts arising from the June 24, 2023 incident. In case No. CRI20230707, it found him guilty of one count of intimidation of an attorney, victim, or witness (Count 1), one count of felonious assault (Count 3), and one count of domestic violence (Count 5)—counts arising from the August 11, 2023 incident. The jury found Hall not guilty of the remaining charges in both cases.

{¶ 29} The trial court sentenced Hall to a minimum term of six years and a maximum term of nine years in prison on Count 1 in case No. CRI20230507 and ninety days in jail on Count 5; Counts 1 and 2 merged for purposes of sentencing. In case No. CRI20230707, the court sentenced Hall to 36 months in prison on Count 1, a minimum term of seven years and a maximum term of ten and one-half years on Count 3, and 90 days in jail on Count 5. It ordered that Counts 1 and 3 in case No. CRI20230707 be served consecutively to each other and consecutively to the aggregate sentence in case No. CRI20230507. Hall's aggregate sentence was a minimum term of 16 years and a maximum term of 19 and one-half years.

11.

**{¶ 30}** Hall appealed. He assigns the following error for our review:

Defendant was deprived of his right to the effective assistance of counsel, in derogation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

## II. Law and Analysis

**{¶ 31}** In his sole assignment of error, Hall argues that trial counsel was ineffective for failing to object to testimony concerning (1) A.K.'s credibility, (2) his guilt and veracity, (3) hearsay testimony, and (4) irrelevant evidence and opinion testimony. Specifically, Hall maintains that the State elicited testimony from Deputy Tynan, Sergeant Fulton, O.L., and M.L. concerning their belief that A.K. was credible. He claims that on the re-direct examination of Sergeant Fulton, the State elicited testimony to the effect that the State had proven every element of the offense of aggravated burglary and that Hall was guilty. Hall insists that O.L. was permitted to testify about her knowledge of A.K.'s relationship with Hall, which was based entirely on what A.K. had told O.L. and other people. And Hall claims that Deputy Tynan rendered impermissible opinions as to Hall and A.K.'s motivations, Sergeant Fulton was permitted to opine that domestic abuse "can rise to a higher level when you have such a disparity in age group," and A.K. was allowed to describe her abusive childhood even though this was not relevant to any issue at trial. Hall insists that trial counsel's "wholesale failure to object to all manner of inadmissible evidence undermine[d] confidence in the outcome of the trial."

12.

{¶ 32} The State responds that trial counsel's failure to object was trial strategy and emphasizes that the court instructed the jury that it was the sole judge of the witnesses' credibility. It points out that trial counsel made clear during opening statements that he intended to paint A.K. as not credible, and his failure to object was part of this strategy. The State denies that it elicited opinions from Sergeant Fulton that it had proved all the elements of the offenses here and claims that defense counsel opened the door to this testimony anyway. The State claims that Deputy Tynan and Sergeant Fulton's testimony that (1) a younger person would be more easily controlled by the older person, and (2) domestic violence can rise to a different level when there is an age disparity, was based on their training and experience, and it was trial strategy not to object to these statements. Finally, the State insists that the evidence of A.K.'s abuse as a child was relevant to help explain her conduct during her relationship with Hall. The State ignores Hall's arguments about improper hearsay evidence.

{¶ 33} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287 (7th Dist. 1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-

13.

3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002).

{¶ 34} Properly licensed Ohio lawyers are presumed competent. *State v. Banks,* 2002-Ohio-4858, ¶ 16 (9th Dist.). To establish ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland* at 688-692. As recognized in *Strickland,* there are "countless ways to provide effective assistance in any given case." *Id.* at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989), quoting *Strickland* at 689.

{¶ 35} Moreover, in matters involving trial strategy, "courts will generally defer to the judgment of trial counsel, even where 'another and better strategy' might have been available." *State v. Newsome*, 2005-Ohio-3775, ¶ 8 (11th Dist.), quoting *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980). "A court will only consider reversing on these grounds where the choice of trial strategy so deviates from the standard of reasonableness 'that ordinary trial counsel would scoff at hearing of it.'" *Id.,* quoting *State v. Burgins*, 44 Ohio App.3d 158, 160 (4th Dist. 1988).

## A. Credibility

{¶ 36} The State elicited testimony from Deputy Tynan indicating that he found A.K. "one hundred percent credible that night[.]" It also elicited testimony from Sergeant

14.

Fulton, O.L., and M.L. that they found A.K. to be credible. And it elicited testimony from Sergeant Fulton that there were reasons that A.K. may have lied about not being pregnant and he believed her when she said she was pregnant.[5]

{¶ 37} The State responds that defense counsel initiated the questioning concerning A.K.'s credibility when he cross-examined Deputy Tyman, he attacked A.K.'s credibility "at every turn," and he presented witnesses who were asked to testify as to A.K.'s reputation for being dishonest. It points out that in addition to A.K. testifying at trial, body camera footage was admitted into evidence from which the jury could assess A.K.'s credibility, and it is clear that the jury, in fact, made its own credibility determinations given that it acquitted Hall of numerous charges. Finally, the State contends that the failure to object was trial strategy.

{¶ 38} The State's attorney unambiguously and directly asked four witnesses whether they believed A.K. was credible in her accusations against Hall. A witness's opinion about the victim's veracity is inadmissible. *State v. Bey,* 2025-Ohio-740, ¶ 35 (8th Dist.). "Witnesses, whether experts or laymen, may not testify regarding their opinions on the credibility of other witnesses, because that infringes on the domain of the trier of fact." *State v. Knuff*, 2024-Ohio-902, ¶ 157. It is especially inappropriate to elicit an investigating officer's opinion about whether he found the victim credible. *State v. Hensley,* 2005-Ohio-664, ¶ 38 (6th Dist.).

---

[5] A.K. testified at trial that she was pregnant on June 24, 2023, but she terminated the pregnancy.

15.

**{¶ 39}** As the State points out, defense counsel initiated a line of questioning concerning the victim's credibility. In cross-examining Deputy Tyman, defense counsel emphasized that for an offense like menacing, where the accusation is that there have been threats of harm but no actual physical injury, the credibility of the parties is important. He elicited from Deputy Tyman that he has been involved in situations where he has declined to file a criminal complaint because he deemed the allegations not to be credible. Counsel went on to state: "Well, I guess based on what you saw that day you found [the victim] to be credible." On redirect, the State's attorney asked Deputy Tyman: "You found [A.K.] one hundred percent credible that night, didn't you?" He asked several more times whether Deputy Tynan found A.K. credible.

**{¶ 40}** The State's questions elicited inadmissible opinions concerning the victim's credibility—unnecessarily so, given that defense counsel had already made the point that Deputy Tyman found the victim credible. That a defendant's strategy is to challenge the victim's credibility does not open the door for the State to specifically ask its witnesses whether they find the victim credible. Rather, the procedure set forth in Evid.R. 608(A) must be followed. The same is true as to the questions about credibility posed to Sergeant Fulton, O.L., and M.L., where the State first sought their opinions about A.K.'s credibility on direct examination. We agree that defense counsel should have objected to these questions. If he had done so, it would have been incumbent on the trial court to sustain his objections. We cannot say that it was sound trial strategy to repeatedly allow the State to present testimony bolstering A.K.'s credibility. To that end, we find counsel's

performance deficient. However, to constitute reversible error, we must also find that there is a reasonable probability that, but for counsel's errors, the proceeding's result would have been different—i.e., that Hall was prejudiced.

{¶ 41} Here, we cannot say that there is a reasonable probability that the results of the proceedings would have been different. There are two primary reasons for our conclusion.

{¶ 42} First, the jury acquitted Hall of several charges. This suggests that despite the opinions of the officers and A.K.'s co-workers, the jury independently assessed A.K.'s credibility and found her to be credible concerning certain allegations—the June 24, 2023, and August 11, 2023 incidents—but not credible concerning others—the assault with the Absolut vodka bottle.

{¶ 43} Second, there was overwhelming evidence that Hall committed the offenses of which he was convicted. Specifically, with respect to the June 24, 2023 break-in, in one of the calls Hall made from the jail, he admitted that he knew what he was doing was illegal. Specifically, he said, "I knew what I was doing was dangerous and illegal . . . and I knew I was putting myself at risk." Moreover, body cam recordings showed that while still under the stress of the event, A.K. told the officers that Hall threatened to kill her. Likewise, with respect to the August 11, 2023 assault, in a jailhouse phone call, Hall said that he would "admit to what he did, which is, yeah, I hit her that night. I was really intoxicated and found out a bunch of bad stuff. . . . It was domestic violence, that's what it was." On top of that, photos and text communications with Hall corroborated A.K.'s

17.

testimony and showed that A.K. had not merely been "hit"—she had been beaten bloody, to the point that her eyes were black and too swollen to drive or to go to work.

{¶ 44} Accordingly, we conclude that while counsel was deficient in failing to object to the State's questions eliciting credibility opinions from Deputy Tynan, Sergeant Fulton, O.L., and M.L., Hall was not prejudiced because it is clear that the jury made its own credibility determinations and Hall's convictions were supported by admissions and other strong corroborating evidence.

## B. Opinions

{¶ 45} Hall claims that Sergeant Fulton was permitted to testify that each element of the crimes had been established. He maintains that defense counsel was ineffective for failing to object to the following exchange that occurred during the State's redirect examination of Sergeant Fulton:

> Q. It is -- technically, it should read -- it can read that the offender inflicted or attempted or threatened to inflict physical harm. Now if I added that to the elements of aggravated burglary, would you agree with me that threatening somebody's life rises to that level?
>
> A. Yes.
>
> Q. Is it your understanding with aggravated menacing that it would be for the -- for the victim to believe that the defendant would cause serious physical harm and mental stress?
>
> A. Yes.
>
> Q. So it doesn't take an actual act, it's a belief?
>
> A. Correct.

18.

Q. Or it's a belief that she would have serious physical harm and mental distress. You'd agree with that?

A. Yes.

Q. Another charge which -- which in this case, which we're alleging with regard to the burglary would be domestic violence. There are domestic violence threat sections, is there not?

A. Yes.

Q. Okay. So if the defendant believed that the defendant would cause imminent physical harm, that would be enough, wouldn't it? Is that not correct?

A. That's my understanding.

Q. Okay. So the idea that we physically have to strike her at this time of the burglary -- the idea you have to physically strike the victim, that – that's not the only sole basis for an aggravated burglary charge now that we covered that, correct?

A. Correct.

{¶ 46} First, we do not read Sergeant Fulton's testimony as rendering an opinion that the State had proven each element of the offenses. Rather, our interpretation is that the State asked generally about Sergeant Fulton's understanding of the elements of the offenses charged. While this testimony hovered a little too closely to the category of a legal conclusion or an opinion on the ultimate issue, *see State v. Elking,* 1981 WL 6775, *2 (3d Dist. Jan. 26, 1981) (observing that defendant's testimony that he did not "rape" the victim "called for a legal conclusion as well as constituted the ultimate question

which the jury had to decide")[6], our review of the transcript reveals that Hall opened the door to this line of questioning. On cross-examination, defense counsel questioned Sergeant Fuller about the elements of burglary and aggravated burglary, suggesting that because Hall did not physically assault A.K., Hall's actions did not rise to the level of burglary or aggravated burglary. On redirect, the State's attorney sought to clarify that threats to inflict physical harm or causing a person to believe that he will inflict imminent physical harm may satisfy certain elements of the crimes, even without the infliction of direct physical harm. We do not find that defense counsel was deficient for failing to raise an objection, and we find that admission of this testimony did not prejudice Hall. *See Wellston v. Horsley,* 2006-Ohio-4386, ¶ 32 (4th Dist.) (finding that defendant was not prejudiced when the State asked witness if "a threat of being hit in the head, or have your head bust[ed] open with a baseball bat" would "constitute a serious physical harm or injury?").

{¶ 47} The State also asked Deputy Tynan if he believed that Hall had made an admission of guilt. Specifically, Deputy Tynan confirmed that Hall acknowledged that if he believed that A.K. may have been in danger, he probably should have called the police instead of climbing the balcony and going into A.K.'s apartment. The State's attorney asked him whether he interpreted this as an admission of guilt, and he testified that he

---

[6] *But see State v. Parsons,* 2019-Ohio-5021, ¶ 6 (9th Dist.) (noting that trial court overruled "legal conclusion" objection and allowed officer to testify that it was important to his investigation that individual owed money to his mother because it was pertinent to "purpose" element of burglary).

did. We need not decide whether defense counsel should have objected to this testimony because we find—for the reasons stated in the preceding section—that Hall was not prejudiced by the admission of this evidence. Hall himself told his mother that he knew what he had done was illegal, and that likely carried much more weight with the jury than Deputy Tynan's interpretation of Hall's statement.

{¶ 48} The State also asked Deputy Tynan what kinds of people scold another person and make accusations of infidelity. Deputy Tynan responded that it is often narcissistic, possessive, manipulative people with low self-esteem. It elicited the officers' opinions that where a victim is 15 years younger than a defendant, she may be more easily controlled by him and abuse may rise to a higher level. It is arguable whether objections to these questions were warranted. But again, we need not decide whether defense counsel was deficient for failing to object to this testimony because Hall was not prejudiced by its admission.

## C. The Victim's Childhood

{¶ 49} The State elicited testimony from A.K. about her childhood. A.K. testified that her mother was abusive, her mother's boyfriend molested her, and her grandmother did not want her in her home. Hall contends that defense counsel should have objected to this evidence. The State responds that this evidence was relevant to explain why A.K. remained in the relationship with Hall despite her allegations of abuse. We agree with the State that this evidence was relevant and was not unfairly prejudicial.

21.

{¶ 50} A.K. initiated contact with Hall almost immediately after his release on bond. There was evidence that she repeatedly drove past his house until he finally agreed to see her, she made inconsistent statements about the extent of Hall's conduct, she appeared very susceptible to his mother and sister's attempts to persuade her to recant some of her allegations, she was very emotional during phone calls Hall made from the jail, and she expressed panic over the prospect of their relationship ending. To understand A.K.'s behavior, it was relevant that A.K. suffered abuse at the hands of her mother and her mother's boyfriend, especially given her testimony that she viewed Hall's family as her own family.

{¶ 51} Had counsel raised an objection to this evidence, it is not likely that it would have been sustained. Accordingly, defense counsel was not deficient for failing to object to this evidence. *See State v. Stevens,* 2024-Ohio-198, ¶ 26 (3rd Dist.) ("The failure to make a futile objection does not constitute deficient performance for an ineffective assistance of counsel claim." (Internal quotations and citations omitted.)).

**D. Hearsay**

{¶ 52} O.L. was permitted to testify at length about things that A.K. and other people told her. She testified that A.K. told her "If I tell him . . . that I want to leave him, he's going to kill me." She also testified that A.K. told her that Hall held guns to her head; that A.K. said that Hall said that if the cops were ever called, he'd engage in a shootout with them; that A.K. told her that Hall found positive pregnancy tests in her trashcan; that she told people at work that she had missed work because Hall had almost

22.

beaten her to death; that A.K. told her that she was trying to keep things with Hall on good terms because she did not know when he would get out of jail; and numerous other hearsay statements. The State does not address this argument.

{¶ 53} We agree with Hall that O.L.'s testimony was replete with hearsay. It is difficult to imagine that this was a strategic decision by defense counsel to allow these harmful hearsay statements to be presented to the jury. But regardless of whether counsel was deficient in failing to register objections to this evidence, we cannot say that there was a reasonable probability of a different outcome had defense counsel objected to the evidence. This is because O.L.'s testimony was entirely duplicative of A.K.'s trial testimony. *See Matter of Joshua H.,* 1998 WL 568038, *6 (6th Dist. Aug. 28, 1998) (finding no prejudice because evidence was cumulative).

{¶ 54} For all these reasons, we find Hall's sole assignment of error not well-taken.

### III. Conclusion

{¶ 55} We find Hall's single assignment of error not well-taken. Although counsel was deficient in failing to object to certain questions eliciting hearsay and opinions about the victim's credibility, he was not deficient in failing to object to questions concerning the victim's childhood. Moreover, we conclude that there was no reasonable probability of a different outcome in the absence of defense counsel's deficient performance.

23.

**{¶ 56}** We affirm the May 6, 2024 judgments of the Huron County Court of

Common Pleas.  Hall is ordered to pay the costs of this appeal under App.R. 24.

Judgments affirmed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.                                             
_____
JUDGE

Myron C. Duhart, J.       

Charles E. Sulek, P.J.            
_____
CONCUR.                                            
JUDGE


_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.